# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JAMES EDWARD EMERSON,

          Petitioner,

v.                                      **Case No. 15-CV-180**

MICHAEL MEISNER,[1]

          Respondent.

## DECISION AND ORDER

### 1. Background

Rhonda Mertes, a 37-year old white woman (ECF Nos. 69-1 at 6-7; 69-2 at 70; 16-18 at 22, 33), spent the night of December 3, 1999, out with her boyfriend. As the couple often did, they visited the bars in downtown Wausau, Wisconsin, including the 101 Pub where they were regulars. (ECF No. 16-20 at 92-103, 115.) Although her boyfriend went home at about 1:00 AM (ECF No. 16-20 at 103), Mertes stayed at the bar until it closed. She left the bar at the same time as about 15 other patrons, one of whom was James Emerson, a black man. (ECF Nos. 16-20 at 176; 16-24 at 79); *State v. Emerson*, 2012 WI App 88, ¶ 3, 343 Wis. 2d 678, 819 N.W.2d 562, 2012 Wisc. App. LEXIS 510. Mertes was

---

[1] The caption is updated to identify as the respondent the warden of the institution where the petitioner is currently incarcerated.

last seen walking east from the 101 Pub, initially with two white men but then later alone. (ECF No. 16-21 at 132-33, 136-38.)

About five hours later, a group of joggers found Mertes deceased near an abandoned building by the river in downtown Wausau. Her clothes were ripped, her pants were pulled down, her head had been severely beaten, a pool of blood surrounded her, and a bloody rock was nearby. *Emerson*, 2012 WI App 88, ¶ 2; *State v. Emerson*, 2019 WI App 65, ¶ 2, 389 Wis. 2d 377, 936 N.W.2d 413, 2019 Wisc. App. LEXIS 552; (ECF No. 16-19 at 48-51.) Although she was an infrequent user of marijuana, preferring cocaine and Valium instead (ECF No. 16-20 at 119, 123-24; *see also* ECF Nos. 16-21 at 107, 119 (witness testifying that he smoked marijuana three to five times with Mertes years before her death); 16-24 at 132 (witness testifying that he smoked marijuana with Mertes about eight times in the ten years before her death)), a baggie of marijuana was found in her pocket (ECF Nos. 16-18 at 43, 47; 16-22 at 101; 69-2 at 83). According to her boyfriend, he had been expecting her to bring some marijuana home for him that evening. (ECF No. 16-20 at 127.) And another man testified that he received marijuana from Mertes shortly before her death. (ECF No. 16-25 at 131-32.)

Investigators questioned those who had been at the bar, including Emerson. Emerson, who frequented the 101 Pub (ECF No. 16-21 at 108), was very cooperative and had no apparent injuries. (ECF No. 16-20 at 177, 180.) He stated he went to the bar shortly before closing, asked for a drink, was told by the bartender (who called Emerson

by name) that the bar was closing, left with the crowd, and walked home. He denied seeing Mertes that night or even knowing her. (ECF Nos. 16-20 at 175-80; 16-22 at 165, 180.) The case went cold.

In 2001 one of Emerson's co-workers anonymously reported to Crime Stoppers that Emerson had mentioned being with Mertes on the night of her death and that he was "very curious" about her death—for example, asking him if he knew anything and asking to read newspaper coverage of the investigation. (ECF No. 16-21 at 77, 81.) Although Crime Stoppers gave the co-worker a number to follow-up with, he never did, at least not until years later when he encountered a police officer he knew and repeated the information he had given Crime Stoppers. (ECF No. 16-21 at 79-80.)

In 2005 investigators seeking to take advantage of advancements in DNA technology resubmitted evidence relating to Mertes's murder to the crime lab. *Emerson*, 2019 WI App 65, ¶ 3. This re-analysis resulted in technicians isolating Y-STR DNA from Mertes's underwear and clippings taken of her fingernails. *Id.* A lab was also able to identify mitochondrial DNA from hairs recovered from Mertes. *Id*.

Investigators set about re-interviewing and acquiring DNA from over 50 people. *Emerson*, 2019 WI App 65, ¶ 5; (*see also* ECF No. 16-24 at 79 (testimony that investigators obtained buccal swabs from about 80 suspects)). Emerson voluntarily provided a DNA sample. *Emerson*, 2019 WI App 65, ¶ 4. Testing eliminated all tested persons except Emerson as a possible source of the DNA on Mertes's underwear, the blood under her

fingernails, and the third-person hairs found on her body. (ECF Nos. 69-2 at 203-04, 273-74; 16-23 at 78-88); *Emerson*, 2019 WI App 65, ¶ 5. An analyst was also able to conclude that the hair recovered from Mertes was physically consistent with Emerson's hair. (ECF Nos. 69-2 at 193; 16-23 at 55-56.)

Y-STR DNA is different from the nuclear DNA popularized in crime dramas. Rather than identifying an individual, Y-STR DNA is capable of identifying only a paternal bloodline. (ECF No. 16-22 at 46-47.) Any male who shares a common paternal ancestor will have the same Y-STR DNA profile. Thus, sons, fathers, grandfathers, and even distant cousins (provided they have a common paternal ancestor) will have the same Y-STR DNA. (ECF Nos. 16-22 at 47-49; 16-25 at 10-11.)

Mitochondrial DNA, on the other hand, is inherited from a person's mother and therefore is present in both male and female descendants. (ECF No. 16-23 at 67.) And although mitochondrial DNA is highly variable among individuals, it is possible for two unrelated persons to share mitochondrial DNA. (ECF No. 16-23 at 69.) The only blood relative Emerson reported having ever been in Wisconsin was his son, who was a young child at the time of Mertes's murder. (ECF No. 16-24 at 11.)

Investigators arrested Emerson and continued their investigation. At trial, the jury heard of two other incidents involving Emerson. In the first, occurring more than three years before the Mertes murder, an 18-year-old woman was walking to watch fireworks on July 4, 1996, when Emerson approached her, got very close to her face and

said how he wanted to beat her with a baseball bat, shoot her full of drugs, and "fuck the shit out of" her. (ECF No. 16-22 at 108-12.) Emerson retreated only when the woman's boyfriend came upon the scene and intervened. (ECF No. 16-22 at 115.) The couple fled and called the police, who apprehended Emerson. (ECF No. 16-22 at 116-17.)

The second incident occurred about six months after the Mertes murder when Emerson approached two women who had just left a Wausau bar around midnight on May 7, 2000. (ECF Nos. 16-22 at 128-30.) Emerson drove up and started talking to the women through his open window. (ECF No. 16-22 at 131; 16-23 at 6-7.) He asked them if they would go to a bar with him and, when they demurred, asked if they would go with him to a hotel. (ECF No. 16-22 at 13; 16-23 at 8.) When they rebuffed him again and began to walk away, he got out of his car (leaving it running in the middle of the street) and started to follow them. (ECF No. 16-22 at 132.) He then offered them money to go to a hotel with him. (ECF No. 16-22 at 132.) When they again refused, he approached them, grabbed one woman's buttocks, kissed her neck, squeezed her breast, and brought her hand to his genitals. (ECF Nos. 16-22 at 134-35; 16-23 at 11.) When, with her friend's help, she was able to push Emerson away, he started doing the same things to her friend, again refusing to accept their refusals and demands that he stop. (ECF Nos. 16-22 at 134-137; 16-23 at 11-14.)

The two women were able to get to their car but were unable to get in and lock the door before Emerson was able to climb in on top of the woman in the driver's seat.

(ECF Nos. 16-22 at 137; 16-23 at 15.) They were able to get him out of the car only after agreeing to his repeated demands that they go to a hotel with him. (ECF No. 16-22 at 139.) He demanded to go with them in their car, but when the woman pointed out that he had left his car running in the middle of the street, he got out, but first said in a threatening tone, "Don't leave me." (ECF No. 16-22 at 140; *see also* ECF No. 16-23 at 17-18.) The woman in the driver's seat pushed him out and they drove away. (ECF No. 16-22 at 140.) Emerson was arrested, charged, and convicted of fourth degree sexual assault as a result of this incident. (ECF No. 16-27 at 22, 27, 45, 46.)

The jury also heard from Emerson's girlfriend's son, who was nine years old in 1999. He recounted an incident he remembered shortly after Mertes's murder. As he was riding with Emerson and Emerson's girlfriend (the boy's mom), Emerson broke down crying, saying he needed to get out of town and was going to die. (ECF No. 16-21 at 95.) Later, as they were watching the television news, a story about Mertes's murder came on and Emerson was "[v]ery nervous." (ECF No. 16-21 at 97.) The jury further heard that Emerson's girlfriend had told a friend that Emerson had confessed to killing Mertes. (ECF No. 16-22 at 165-66.) Emerson's girlfriend killed herself shortly after reporting this to her friend. (ECF No. 16-22 at 165.)

While in custody Emerson allegedly told two inmates that he killed Mertes. *Emerson*, 2019 WI App 65, ¶ 6. One inmate, Elmer Allen, considered himself a bit of a jailhouse lawyer and started talking to Emerson about his case, trying to help him with

his defense. (ECF No. 16-22 at 192, 202-03.) He also apparently had an affinity for Nazis, as indicated by the large swastika tattoo on his back. (ECF Nos. 16-26 at 27-29; 69-1 at 47-48.) Allen reported that Emerson told him he left the bar with Mertes, intending to go smoke marijuana that he had. (ECF No. 16-22 at 194.) He hit her when she refused to have sex with him and continued to hit her as she cried. (ECF No. 16-22 at 194-99.)

The other inmate, Timothy Sliwicki, testified that he introduced Emerson to Mertes about six months before her murder, and that he, Emerson, and Mertes had on prior occasions smoked marijuana together. (ECF No. 16-24 at 95-104.) When Sliwicki and Emerson met again in jail, Emerson first denied knowing Mertes (ECF No. 16-24 at 107), but later said he did not mean to kill her (ECF No. 16-24 at 109). Emerson also told Sliwicki that he had told his girlfriend he had killed Mertes, and soon thereafter his girlfriend killed herself. (ECF No. 16-24 at 111.) Sliwicki's information came to the attention of investigators only after Sliwicki encountered Mertes's son in jail, told him what he knew, and was encouraged by Mertes's son to provide the information to investigators. (ECF No. 16-24 at 113-14.)

Sliwicki's testimony about the fact that Mertes and Emerson knew each other and had smoked marijuana with Sliwicki was consistent with that of Emerson's former boss, who was also a 101 Pub patron who knew Mertes. (ECF No. 16-24 at 131-38.) Emerson's boss, who sold the marijuana to Sliwicki and Emerson (ECF No. 16-24 at 133-34), was

also a paid police informant, generally informing on others dealing drugs at the 101 Pub. (ECF No. 16-24 at 142.)

A jury from small, rural, and "racially homogenous" Iowa County (ECF No. 16-16 at 3-4) was selected to try the case because of pretrial publicity in Marathon County, where the murder took place. *Emerson*, 2012 WI App 88, ¶ 8. The questionnaires sent to prospective jurors revealed, in the characterization of defense counsel at trial, a "startl[ing] … number of responses that indicate an overt racial bias." (ECF No. 16-16 at 9.)

L.B.[2] was among the panel of prospective jurors. (ECF No. 16-16 at 21.) She was one of the roughly dozen prospective jurors who stated on their questionnaires "quite clearly [and] unapologetically, that they are against interracial marriage." (ECF No. 16-16 at 9 (characterization of defense counsel).)

L.B. stated she did not approve of interracial marriage and, although she would not oppose a family member or close friend marrying a person of another race, she would not like it. (ECF No. 16-16 at 168.) She never had a bad experience with any black person and, in fact, did not have much contact with black people; she attributed her views to "my generation." (ECF No. 16-16 at 169.) She held these views despite her

---

[2] Although the juror was identified by her surname in prior decisions, the court refers to her only by her initials. The court finds that publicizing the names of jurors in judicial decisions to be contrary to public policy. Publicity may deter honest and complete answers during voir dire, especially when socially unacceptable or controversial subjects are at issue. Although the trial court does not appear to have ever explicitly assured L.B. of the confidentiality of her responses, in an effort to elicit candor the relevant questioning of L.B. occurred in chambers and the court made statements to other jurors that could be regarded as assurances of privacy. (*See, e.g.*, ECF No. 16-16 at 69.)

cousin having married a black person, a relationship that everyone in her family accepted. (ECF No. 16-16 at 170-71.) She also stated she would not approve of black men having sex with white women. (ECF No. 16-16 at 171.)

Asked about if, given her "ambiguous feelings about black persons," could she put those feelings aside in a case of a white woman leaving a bar and being brutally bludgeoned to death, she responded, "Well, I would question why she went." (ECF No. 16-16 at 171-72.) Asked to explain, she said, "Well, she probably would be alive now." (ECF No. 16-16 at 172.) She denied her response was a product of any "sort of distrust or suspicion of blacks or a fear of blacks." (ECF No. 16-16 at 173.) She also denied that she was blaming the victim. (ECF No. 16-16 at 173.) Ultimately, she confirmed that she would be able to set aside any views she has, be fair and impartial, follow the law, and afford the defendant the presumption of innocence. (ECF No. 16-16 at 174-76.)

L.B. was ultimately part of the jury that found Emerson guilty of first-degree intentional homicide. (ECF Nos. 16-1 at 1; 16-17 at 131-32.) The court sentenced Emerson to life in prison without the possibility of parole. (ECF No. 16-1 at 1.)

Following significant delays to allow Emerson to exhaust his remedies in state court, Emerson's petition for a writ of habeas corpus is now ready for resolution. In his brief in support of his petition, he abandons all but one claim—that his trial counsel was ineffective for not seeking to strike L.B. for cause. (ECF No. 76 at 11, fn. 4.)

## 2. Applicable Law

A person incarcerated pursuant to a state court judgment who seeks habeas relief in federal court faces a high hurdle. *Turner v. Brannon-Dortch*, 21 F.4th 992, 995 (7th Cir. 2022). A habeas petitioner is entitled to relief only if "the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'" *Turner*, 21 F.4th at 995 (quoting 28 U.S.C. § 2254(d)(1)). "This standard is difficult to meet." *Id.* (quoting *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam)).

Habeas relief is "not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011). Rather, it is reserved for "extreme malfunctions in the state criminal justice systems." *Id.* at 103 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). Thus, a petitioner is not entitled to relief merely because he can show that the state court's decision was wrong. The petitioner must show that the state court's decision was so wrong as to be unreasonable. *Mays*, 141 S. Ct. at 1149. A decision is unreasonable only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 102.

Claims of ineffective assistance of counsel are governed by the well-established two-prong approach set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hicks v. Hepp*, 871 F.3d 513, 525 (7th Cir. 2017). A petitioner must demonstrate both that his

attorney's performance was deficient and that he was prejudiced as a result. *Id.* at 525-26. The first prong "requires that the petitioner demonstrate that counsel's representation fell below an objective standard of reasonableness." *Id.* at 525. "What is objectively reasonable is determined by the prevailing professional norms." *Id.* But there is a wide range of permissible conduct, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* (quoting *Strickland*, 466 U.S. at 690). The prejudice prong "requires the petitioner to demonstrate a 'reasonable probability that, but for counsel's unprofessional errors,' the outcome would have been different." *Id.* at 526 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009)).

When a claim of ineffective assistance of counsel is presented in a habeas petition, the petitioner faces "a high hurdle." *Hicks*, 871 F.3d at 525. "The Supreme Court has instructed that under these circumstances, [the federal court] must employ a 'doubly deferential' standard, one which 'gives both the state court and the defense attorney the benefit of the doubt.'" *Id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

### 3. Analysis

Emerson's claim rests on L.B.'s answers to questions during voir dire. Because the questions and answers were at times nuanced and ambiguous, the court quotes those roughly ten pages of transcript in their entirety.

> THE COURT: Ms. [L.B.], we are going to ask you some questions. I go first. When I'm done, Mr. Thompson might have some of you. And then a

representative of the State. Okay? And, when you respond to any question, you need to respond verbally for the sake of the court reporter.

JUROR [L.B.]: Okay.

THE COURT: And the thing we ask of you is that your answers be truthful and honest, no matter what the question might be. Okay?

JUROR [L.B.]: All right.

THE COURT: Now, I believe that when an inquiry was made in court earlier about whether anybody had read or heard anything beyond the case -- beyond what they raised on the questionnaire, you raised your hand. Is that right?

JUROR [L.B.]: Uh-huh, yes.

THE COURT: And can you tell me, to the best of your recollection, what you've seen or heard beyond what you put in your --

JUROR [L.B.]: In yesterday's Wisconsin State Journal, it was about us getting the wrong message.

THE COURT: Okay. And then having to come back?

JUROR [L.B.]: Uh-huh.

THE COURT: Okay.

JUROR [L.B.]: And that it told about the –-

THE COURT: Okay. Told about what?

JUROR [L.B.]: What we were going – the trial would be about.

THE COURT: Okay. Anything beyond that?

JUROR [L.B.]: No.

THE COURT: Okay. And you understand that if you are chosen as a juror, you have the responsibility to disregard anything you may have seen or heard outside the courtroom, and your job is to base your decision upon the testimony and evidence that comes in at trial?

JUROR [L.B.]: Yes.

THE COURT: Okay. And, if you are chosen as a juror, can you carry out that responsibility?

JUROR [L.B.]: Yes.

THE COURT: Thank you. Mr. Thompson, any questions?

MR. THOMPSON: Yes. This should have been a check mark, Judge. I guess, Ms. [L.B.], you indicated you did not approve of interracial marriages, correct?

JUROR [L.B.]: Yes, I did.

MR. THOMPSON: And then the next question, how would you feel if a family member or close friend married someone of another race; you said you would not oppose it, but would -- wouldn't like it?

JUROR [L.B.]: That's true.

MR. THOMPSON: Okay. Why do you not approve or why do you -- well, that's your -- why do you not approve of interracial marriages?

JUROR [L.B.]: I don't know. I guess it's my generation. I don't know.

MR. THOMPSON: You don't indicate that you ever had any bad experiences with black individuals?

JUROR [L.B.]: No.

MR. THOMPSON: Were you afraid of black individuals at any time?

JUROR [L.B.]: No.

MR. THOMPSON: Have you had much contact with black individuals?

JUROR [L.B.]: Not really.

MR. THOMPSON: Okay. And, specifically, what does your generation think about interracial marriages that apparently you share?

JUROR [L.B.]: Well, I don't know. I guess we were just brought up that way. We didn't live around any black people when I was growing up.

MR. THOMPSON: Would you say that is a large part of whatever it is you fear?

JUROR [L.B.]: Well, maybe. I don't know.

MR. THOMPSON: Distrust?

JUROR [L.B.]: No, I guess, because I didn't be around any. I really don't know.

MR. THOMPSON: Well, if you didn't know, why wouldn't you just be indifferent to interracial marriage?

JUROR [L.B.]: What did you say?

MR. THOMPSON: If you didn't know any black persons or not know any, why wouldn't you be just indifferent to interracial marriages?

JUROR [L.B.]: I don't know what you mean.

MR. THOMPSON: Well, you apparently live in a community where interracial marriages were not approved, and, being a member of the community, I think you have picked up that attitude, right?

JUROR [L.B.]: Yeah, we was in a farming community.

MR. THOMPSON: Now, do you know anyone who has children or grandchildren who have married a black person?

JUROR [L.B.]: Yes, my cousin.

MR. THOMPSON: And when was that? What year?

JUROR [L.B.]: I -- we was at a family reunion, and they were there, and that's the first, first I knew of it.

MR. THOMPSON: And that's the first you realized the other party was black?

JUROR [L.B.]: Uh-huh.

MR. THOMPSON: Okay.

JUROR [L.B.]: Yes.

MR. THOMPSON: And was there a comment among your relatives about that marriage?

JUROR [L.B.]: No. Everybody accepted it.

MR. THOMPSON: Isn't there a sort of a feeling of the unknown, perhaps a little anxiety about interracial marriages that is part of this community attitude?

JUROR [L.B.]: Could be.

MR. THOMPSON: Do you have any objection to black men having sex with white women?

JUROR [L.B.]: I never thought much about it.

MR. THOMPSON: Well, take a moment. Kind of tell me what your reaction is.

JUROR [L.B.]: I don't, I don't think I would approve of it.

MR. THOMPSON: Okay. And why not?

JUROR [L.B.]: I don't know.

MR. THOMPSON: Okay. In this case, if you were to be a juror, there's going to be testimony that the white victim, a female victim, left the bar at bar time, at this -- approximately the same time this defendant was also at the bar, and then the victim was brutally murdered, bludgeoned to death in a remote area that night, and the evidence would be quite graphic. There would be blood. There would be very, very serious injuries to the face and head. There would be pictures, photographs, autopsy reports, and it would be, I think it would be natural to feel a great deal of sympathy for the victim. Now, given your kind of ambiguous feelings about black persons, or maybe just feelings you can't really articulate, are you sure that some of these feelings would not come in to your, in to your weighing the evidence in the case, suspicion, or fear, or distrust? Can you say, to a certainty, that you could put those feelings aside?

JUROR [L.B.]: Well, I would question why she went.

MR. THOMPSON: Why she what?

JUROR [L.B.]: Went.

MR. THOMPSON: You mean, why she went wherever she went?

JUROR [L.B.]: Uh-huh, I would question that.

MR. THOMPSON: Why do you think that would be significant?

JUROR [L.B.]: Well, she probably would be alive now.

MR. THOMPSON: When you say "why she went," are you assuming that she went with a black man. Is that it?

JUROR [L.B.]: Well, that's what you are insinuating.

MR. THOMPSON: But, by saying if why she went with a black man, does that, again, show sort of a distrust or suspicion of blacks or a fear of blacks on your part?

JUROR [L.B.]: No, not really.

MR. THOMPSON: I have no further questions.

THE COURT: Anything from the State?

MS. FALSTAD: When you just made that comment about you would wonder why the victim went with the black man, do you know if -- let's say they went to have a drink or do something, would you tend to then blame her for what happened?

JUROR [L.B.]: No, I wouldn't blame her.

MS. FALSTAD: Okay. Just would help you maybe understand the context what happened --

JUROR [L.B.]: Yeah.

MS. FALSTAD: -- or --

JUROR [L.B.]: I just wondered why she would do this, but was she good friends, or was she – just wanted to go and have a drink? You know, you wonder.

MS. FALSTAD: But, again, that would be part of the information you might receive about what their connection was.

JUROR [L.B.]: Uh-huh.

MS. FALSTAD: And, if they were acquaintances, you know, from a bar setting, or there is some other explanation, would that still, in any way, make you blame the victim for going with him, that she would deserve what happened then?

JUROR [L.B.]: No, no, I don't think I would blame the victim, no.

MS. FALSTAD: Okay. Is there anything, when you talked about your generation and the way you were brought up, you know, that's natural, because that's the area you lived in, I think is what you are saying?

JUROR [L.B.]: Uh-huh.

MS. FALSTAD: Are you able to set aside any of those preconceived notions?

JUROR [L.B.]: I have, you know, in the last few years, because of my children, they accept everybody, and so I have, too, then.

MS. FALSTAD: Kind of learned from your kids to be open?

JUROR [L.B.]: Yup.

MS. FALSTAD: And willing to learn about different and new people?

JUROR [L.B.]: Uh-huh, uh-huh.

MS. FALSTAD: So there's nothing about the generation you were brought up in that would -- that you couldn't set aside and just focus on the facts and evidence as they come in to the trial? You feel like you could be fair and impartial to both the defendant and to the State --

JUROR [L.B.]: Yes, uh-huh.

MS. FALSTAD: -- and not be influenced by any racial concerns?

JUROR [L.B.]: No, I don't think so now.

THE COURT: Okay. Ma'am, you understand that Mr. Emerson, just like every other citizen in this country, is protected by the presumption of innocence?

JUROR [L.B.]: Uh-huh.

THE COURT: And, if you are instructed that he is afforded the presumption of innocence, would you follow that law?

JUROR [L.B.]: Yes, uh-huh.

THE COURT: And he cannot be found guilty unless the State proves beyond a reasonable doubt to a jury that he committed the crime. Are you accepting of that?

JUROR [L.B.]: Yes.

THE COURT: And if I instructed you that that's the law, would you follow that law?

JUROR [L.B.]: Uh-huh, yes.

THE COURT: Okay. And, if you got to the point where you believed that a fair analysis of the State's case was that they had not met the burden of proof beyond a reasonable doubt, you understand that your duty would be to find the defendant not guilty?

JUROR [L.B.]: Yes.

THE COURT: And, if you got to that point where you believe that the State had not met its burden, would the fact that Mr. Emerson is black in any way keep you from finding that he's not guilty?

JUROR [L.B.]: Say it again. I couldn't catch it all.

THE COURT: Okay. If you get to the point where after you consider all the evidence --

JUROR [L.B.]: Uh-huh.

THE COURT: -- you believe that a fair analysis of the evidence is that he's not guilty, okay, so now you are to the point where you believe the evidence is the State hasn't met its burden of proof and that he is not guilty, would you let the fact that Mr. Emerson's an African American change your decision in any way?

JUROR [L.B.]: No.

THE COURT: You would find him not guilty?

JUROR [L.B.]: Yes, uh-huh.

(ECF No. 16-16 at 166-76.)

"The due process clause of the Fourteenth Amendment entitles a state criminal defendant to an impartial jury, which is to say a jury that determines guilt on the basis of the judge's instructions and the evidence introduced at trial, as distinct from preconceptions or other extraneous sources of decision." *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir. 2004) (internal citation omitted) (citing *Morgan v. Illinois*, 504 U.S. 719, 726 (1992); *Patton v. Yount*, 467 U.S. 1025, 1037 n. 12 (1984); *Irvin v. Dowd*, 366 U.S. 717, 721-23 (1961); *United States v. McClinton*, 135 F.3d 1178, 1185-86 (7th Cir. 1998); *United States v. Angiulo*, 897 F.2d 1169, 1182-83 (1st Cir. 1990)). Racial bias among jurors is especially odious. *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 229, 223, (2017) ("blatant racial prejudice is antithetical to the functioning of the jury system"); *see also Georgia v. McCollum*, 505 U.S. 42, 58 (1992) ("a defendant has the right to an impartial jury that can view him without racial animus").

The court must assess the reasonableness of counsel's decision not to move to strike L.B. for cause only if Emerson was prejudiced by the failure to move to strike L.B. And Emerson was prejudiced only if L.B. was biased and the court would have been required to grant the motion.

"A juror need not be a blank slate to be unbiased. 'Everyone brings to a case a set of beliefs that may incline him in one direction or another.'" *Bailey v. Foster*, No. 15-CV-584, 2018 U.S. Dist. LEXIS 109097, at *6-7 (E.D. Wis. June 29, 2018) (quoting *Griffin v. Bell*, 694 F.3d 817, 824 (7th Cir. 2012); citing *Irvin*, 366 U.S. at 723 ("To hold that the mere

existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."); *Oswald v. Berge*, No. 01-C-689, 2006 U.S. Dist. LEXIS 41672, at *17 (E.D. Wis. June 21, 2006) ("[J]urors undoubtedly bring preconceptions, their thought processes, and their life experiences into the courtroom.")); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982).("[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."). "A juror is biased, in the sense that the Constitution is concerned, if she 'expressed an irrational or unshakeable bias that indicated an inability or unwillingness to faithfully and impartially apply the law.'" *Bailey*, 2018 U.S. Dist. LEXIS 109097, at *7 (quoting *Griffin*, 694 F.3d at 824).

The trial court found that L.B. was not biased. (ECF No. 69-4 at 39.) In denying a motion for post-conviction relief, the trial court lumped together various challenges to several jurors. stating:

> The remaining jurors, who are the subject of the defense motion now before the Court, certainly gave responses in their questionnaires and had experience in their respective lives that raised appropriate questions. However, when their respective voir dires are examined in their entirety, the Court concludes that the jurors were capable of basing their verdict solely on the evidence, willing to afford the defendant his right to the presumption of innocence, willing to put the State to its burden of proof beyond a reasonable doubt, and willing to find the defendant not guilty unless the State provides -- or, proved its case at trial. Accordingly, trial counsel's decision not to challenge these jurors for cause does not justify a new trial.

(ECF No. 69-4 at 39.)

On appeal, the Wisconsin Court of Appeals stated:

Emerson does not refute—or even mention—the circuit court's factual determination that the jurors were capable of basing their verdict solely on the evidence and putting the State to its burden of proof. Based on the court's determination, we conclude counsel was not ineffective for failing to move to strike these jurors for cause.

*Emerson*, 2012 WI App 88, ¶ 46.

Whether a juror was biased is a question of fact. *Patton*, 467 U.S. at 1036; *see also Wesley v. Pfister*, 659 F. App'x 360, 362 (7th Cir. 2016). In the context of a petition for a writ of habeas corpus under § 2254, the court presumes that the factual findings of the state court are correct. 28 U.S.C. § 2254(e)(1). Emerson has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, Emerson can prevail only if he presents clear and convincing evidence that L.B. was biased.

A juror who disapproves of interracial sex or marriage is not, as a matter of law, biased such that she may not sit on a jury in a case of a black man accused of murdering a white woman. *Thomas v. Lumpkin*, 995 F.3d 432, 445 (5th Cir. 2021); *cf. State v. Price*, 2002 WI App 134, 255 Wis. 2d 831, 646 N.W.2d 854; *State v. Tucker*, 226 Conn. 618, 634-38, 629 A.2d 1067, 1076-78 (1993); *People v. Williams*, 63 N.Y.2d 882, 883-85, 483 N.Y.S.2d 198, 199-200, 472 N.E.2d 1026, 1026-27 (1984); *State v. Smith*, 430 So. 2d 31, 38 (La. 1983). After all, the propriety of interracial sex or marriage was not an issue in the case. A person's

view of interracial relationships is relevant only insofar as it is probative of a racial (or any other sort of) bias that may prevent the juror from deciding the case in accordance with the law and the evidence. *Cf. State v. Tucker*, 226 Conn. 618, 634-35, 629 A.2d 1067, 1076 (1993) (noting that a voir dire question about interracial marriage "might have revealed subconscious racism on the part of a prospective juror").

L.B. stated that she believed she could be fair and impartial, she would follow the law and afford Emerson the presumption of innocence, and she would not find him guilty unless the state proved him guilty beyond a reasonable doubt. (ECF No. 16-16 at 175.) The trial court reasonably credited L.B.'s statements. Emerson has not shown that the trial court was wrong, much less clearly wrong, to accept L.B.'s statements and find that she was not biased.

Because Emerson has not presented clear and convincing evidence that L.B. was, in fact, biased and incapable of deciding the case based on the law and the evidence, he was not prejudiced by trial counsel's failure to move to strike L.B. for cause. If counsel had so moved, because the trial court found that L.B. was not biased, it would have denied the motion.

### 4. Conclusion

Emerson has failed to show by clear and convincing evidence that the state court was wrong when it found that L.B. was not biased. Consequently, trial counsel was not

ineffective for not moving to strike L.B. for cause. Therefore, the court must deny Emerson's petition.

Because the court finds that it must deny Emerson's petition, it must consider whether to grant him a certificate of appealability. *See* Rule 11, Rules Governing Section 2254 Cases. The court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires more than showing merely that an appeal would not be frivolous. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). But this standard does not require that the applicant to show that some judges would grant the petition. *Id*. Rather, when the court has denied the petition on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The certificate of appealability "shall indicate which specific issue or issues satisfy the showing required by [28 U.S.C. § 2253(c)(2)])."

The court concludes that Emerson has failed to make a substantial showing of a denial of constitutional right. *See* 28 U.S.C. § 2253(c)(2); Rule 11 of the Rules Governing Section 2254 Cases. Therefore, the court will deny him a certificate of appealability.

**IT IS THEREFORE ORDERED** that Emerson's petition for a writ of habeas corpus is denied. The petition and this action are dismissed. The court further denies a certificate of appealability. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 6th day of September, 2024.

_WILLIAM E. DUFFIN_
WILLIAM E. DUFFIN
U.S. Magistrate Judge